beginning with McEvoy v. Fairfield University 19-3924. Mr. Steigman. Yes. Good morning, Your Honor. May it please the court. This is Todd Steigman for the plaintiff appellant Charlene McEvoy. This court should reverse the district court's decision granting summary judgment to defendant in this case because it is contrary to controlling precedent from the Supreme Court and decisions from this court and because the evidence in the record is more than sufficient to support a finding by a jury that defendant discriminated against plaintiff because of her age. While plaintiff held the position of director defendant never communicated to plaintiff that her performance was deficient in any way but it replaced plaintiff with someone 27 years younger and then after plaintiff filed a discrimination claim defendant made a number of allegations about plaintiff for the first time that are demonstrably false and pretextual and in many cases contradicted by either documents or testimony by defendants own witnesses. Defendant also made numerous statements from which a jury could find age bias and age stereotyping which the district court aired by not relying upon. The Supreme Court's decision in Reeves and numerous decisions by this court make clear that the truth or falsity of an employer's explanation is not just an issue that matters but it is a critical issue when as in this case there is evidence that an employer's explanation is demonstrably false and unworthy of belief. Reeves makes clear that it is permissible for the jury to infer discrimination from the falsity of an employer's explanation and an evidence that an employer's explanation is not worthy of credence is prohibitive of discrimination. That is a principle which is fundamental to the adjudication of not only discrimination claims based on age but for all employment discrimination statutes including for race, gender, and religion. In fact, in another one of this court's cases, Sands v. Rice, this court reversed and remanded because the district court indicated that the truth or falsity of the employer's explanation was immaterial. The district court aired in this case by applying some language from this court's decision in McPherson in a way which is directly contrary to Reeves and many other decisions by this court that we have cited in our briefing. As we explained in our initial brief and at pages 12 through 23 of the reply brief, in McPherson and in every other summary order in which this court has cited that same language from McPherson, there was nothing approaching the evidence of falsity and pretext that is present in this case. That language from this court's decision in McPherson cannot be applied to cases such as this when there is substantial proof of pretext and false statements. If that language from McPherson could be applied to cases such as this, it would eviscerate the rule in Reeves and incentivize every employer to offer false explanations because they could still obtain summary judgment by arguing that it does not matter that their explanation was demonstrably false because they simply believed all the false things that they said were true. As the Supreme Court explained in Reeves, it is appropriate that a false explanation is prohibitive of discrimination because the employer is in the best position to explain his decision with the truth. Mr. Segment, this is just she was not reappointed because of her age, other than the fact that the replacement was younger and separate and apart from, I guess what you're saying is the evidence of inconsistent explanations, but separate and apart from that. What is the evidence for this? Yes, thank you. I'd be happy to address that, Your Honor. In addition to the replacement by somebody substantially younger, in addition to the substantial record evidence that the defendant's witnesses made false statements from which the jury could infer discrimination, there's also a substantial record of statements by the defendant and one of the principal decision-makers that are reflective of age bias and age stereotyping. That's addressed in the briefing at pages 45 to 50 in our 26th of the reply, but I'll go through some of it here in particular since it's a concern of the court. So as we indicated, Dr. Williams made statements characterizing the plaintiff and the program under her directorship as traditional, backward-looking, 19th century. There were statements by the defendant in its Commission on Human Rights and Opportunities filing and which was repeated in the briefing to the district court and I believe also in the defendant's brief to this court saying that there was a need to reinvigorate the program, which we think is reflective of age bias. Is that, well, you say reflective of age bias and, you know, I'm receptive, but is that not something that, or statements, criticisms that might apply to anyone? So you might apply that to criticizing a program devised by a 30-year-old or someone under 40 years old. What is it about those statements that's unique to people who fall into the protected category under the statute? Well, I think this court, in some of its opinions that we have cited in the that there are certain false beliefs or assumptions or stereotypes about people relating to their age. But that's not about, but the statements that you've listed are not about her, they're about the program. So what is it about, what are the statements about her? So, Your Honor, I think some of the statements are about her. I think at one point Dr. Williams characterized her specifically as traditional. In one of his statements during his deposition, he characterized her as being rigidly opposed to any changes in the program. And that's consistent with a false assumption and stereotype about older people, that they're opposed to change or to new things. And it's critical in this case that not only were these things said that were stereotypical and reflected age bias about people because of their age, but they're also not true. And so the false statements are not only pretextual because they're false, they're pretextual, and the pretextual statements in themselves compound the inference of age bias because all of the false statements made relate to matters that would support an inference of age bias. And in particular, the statements about the curriculum and being focused on corporate and criminal law, which have no basis in fact, when asked to explain how the program or how Dr. McAvoy's directorship of the program was traditional or backward looking, Dr. Williams offered these false assertions that are demonstrably false and have no evidence to support them in the record about the curriculum and the focus on corporate and criminal law to explain why Dr. McAvoy was wedded to a traditional 19th century approach that was totally fabricated and totally manufactured. So not only were the statements pretextual, but they all directly relate to evidence of age bias and stereotypes. And I think the case that we cited in our... Yeah, I'm sorry. Go ahead. Just Parker. Yeah, I have a couple questions. One, she wasn't fired, right? She was non-continued. I guess it's a semantical difference between firing and non-continued. She was replaced by somebody younger. She had a three-year appointment, didn't she? She had a three-year appointment that was renewed for additional year. And at the end of the one-year renewal, the renewal letter said it would be reviewed at the end of the additional year and could be renewed at the discretion of the university. It wasn't... What entitlement did she have to continue in subsistence? She had a term limited appointment. Well, there was a decision made to non-continue her, and she was in no different position than any at-will employee who doesn't have a legal entitlement or contractual right to continue in a position. But nevertheless, if they're removed and replaced by somebody, despite the absence of a legal entitlement to continue, at-will employees can still claim discrimination with respect to the administration of their replacement. This wasn't an issue that was briefed or argued by the other side or identified by the district court. If it's something that the court would like some cases on, I would request an opportunity to do a supplemental brief on it if it's a concern to the court. Now, you've answered the question. Thank you. The other question I have follows up on Judge Loya's question. I mean, the statements are by academic administrators, and they have a responsibility to be sure that the program is being run up to university standards and is achieving the goals that the university wants. I'm having trouble following your logic that the comments directed at a program that your client was administering and administering satisfactorily from the viewpoint of the people who were responsible for superintending these programs, this program, is indicative of criticism of the program as opposed to her. Well, Your Honor, I'd say a couple of things about that. One, I think that the statements by Dr. Williams that we've keyed in on are not all just about the program. Some of them are about her. I think that he said that she was traditional. She was rigid in opposition to changing the program. It's critical here that we're not conceding the fact that these were legitimate concerns about how the program was run. These are things that were completely manufactured out of whole cloth after the fact. Dr. Williams, for instance, had criticisms about the program's curriculum. There was no curriculum. It wasn't a major. It wasn't a minor. It wasn't a concentration. It wasn't a degree program. It was a law school advising capacity. And so when he's saying that... Why is that a lie? In other words, maybe that's a misunderstanding of what this pre-law advisory program consists and is meant to do. But why is calling it a curriculum a lie? Well, because he's making a statement that was demonstrably false. He was saying that the curriculum had a focus on corporate and criminal law when there was no curriculum. It had no basis in fact. And it was never raised previously at any point in the case prior to his deposition. I think that what happened was he was calling Dr. McAvoy and the program traditional, reflective of an age stereotype and an age bias. And when asked to explain what that was, he just had to come up with things on the fly at his deposition. And he made statements that were untrue and had no basis in fact. And he also attributed the basis... You said that maybe it's not a curriculum that's traditionally understood, but isn't that about the sort of career focus that the program would have? Like the various career options that they would encourage students to pursue or prepare them for? Right. But that would also be untrue. And so the record evidence that's submitted to the court relating to what the program actually did, including Dr. McAvoy's declaration, which was incredibly detailed, made clear that even with respect to the activities of the program and advice that was given, none of it had anything to do with a corporate and criminal law. Dr. McAvoy arranged and led activities and advised students in fields that were far broader than corporate and criminal law, including program activities... You said earlier that none of the deficiencies were communicated to her in advance, but isn't it undisputed that there were these discussions where they asked her for suggestions of people to succeed her after her term as director of this program was over? That did happen, but I don't think that that would represent the... So wouldn't she at least have been on notice that they were not planning to reappoint her? No, I don't think that... It's not a thing that they... They decided later not to reappoint her. It seems like the discussion of putting somebody else in place at the end of her term began early on. Well, I would respond to that by saying that there was no communication that they were going to replace her before she wanted to leave her post. That could have been a discussion when you're ready, when you no longer want to continue in the program and there's a need to appoint somebody else, who do you have in mind? But that's not what happened here. Okay. And isn't it also undisputed that she didn't create the new internships that are discussed in the record and that she didn't turn over the student data that the proposal suggested she would? That's not disputed, right? So there were no internships created. There's an explanation for that. And I don't think that the person who... I think it's Dr. Fitzgerald who wrote the letter of appointment that referenced the internships after the first year, congratulated Dr. McEvoy on a successful performance. So he didn't view her performance as anything less than satisfactory to the expectations that he had in appointing her. And with respect to the reports, there's no evidence in the record that she did not analyze and collect student data. It wasn't included in the reports that she provided, but it wasn't... She wasn't called Dr. Staff requested that one year and she did that. Didn't the initial proposal say that it would be included in the reports? I think the initial proposal said that she would collect and analyze the data, which she did. One year, Dr. Staff requested that she also provide the data to him. And in that one year, she did do that. But the reports that she used, she used from a template that she obtained from the university. And that template didn't have... You don't think that whenever a plaintiff offers evidence of pretext or makes a prima facie case, you can't succeed on summary judgment. You just think that the evidence here was not sufficient for summary judgment, right? There will be cases where there's weak evidence of pretext that where summary judgment would be proper. Right. So I would refer the court back to Reeves on page 148. And in Reeves, the Supreme Court said that there would be instances such as when no rational fact finder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other non-discriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred. I would respectfully submit to the court that there is no abundant and uncontroverted independent evidence in this case. And there is also... The statements you're talking about, the traditional and backward looking, I mean, you don't deny that somebody could find someone's performance deficient because they ran a program that is in fact traditional and backward looking, right? I think that the critical distinction here, Your Honor, is that those statements had no basis in fact. And so in the cases that we've cited... It's not about the statements themselves. It's about whether it's true. So it's a combination that untrue statements... So your argument is not that simply saying that the thing is backward looking shows that there was discrimination on the basis of the age. You're saying that the program was in fact forward looking, and that is the evidence of pretext. Right. So, Your Honor, I'm saying two things. So I'm saying, one, that these things are pretextual because it was in fact forward looking. But I think it was the court's decision in back that was cited in the briefing, and it may have been in a footnote in that case, explaining that when a pretextual statement lines up with a stereotype or a bias traditionally associated with a protected class, it makes the pretext and the inference of discriminations even stronger. And I think this is one of those... So what's the best piece of evidence that, you know, the argument... Well, they say it's traditional or backward looking, that in fact it was forward looking or innovative. What's something that she did as director of the critique? So I think that every single time that Dr. Williams used the characterization of backward looking or 19th century or traditional, he always said that the evidence for that was the focus on corporate and criminal law. And there was zero focus on corporate and criminal law. And the declaration from Dr. McAvoy and the reports that are in the record talk about all the things that did that were innovative, including trips, speakers, events with lawyers, all kinds of lawyers that did all kinds of things. She involved recent graduates who were in law school. She involved panelists from admissions from law schools. She exposed through these trips, through these programs, through meeting with lawyers. She exposed students to a wide variety of things that you could do in the law. And almost none of them had to do with corporate and criminal law, but that's all in her declaration and annual reports that were submitted at the time. Why don't we hear from... We said to you well past your time. Why don't we hear from Mr. Murphy and then you reserve two minutes for rebuttals. Okay. Thank you, Your Honor. Mr. Murphy. Good morning, Your Honors. My name is Peter Murphy. It's been a good one for Fairfield University. As Your Honors were discussing, the facts leading up to the decision not to appoint her are pretty undisputed. She was appointed to a three-year term starting in the 2013 school year. In 2014, Dr. Williams replaced Dr. Sapp as the Associate Vice President of Academic Affairs. And later that year, Dr. Williams and Dr. Babington decided not to... We're looking for an alternative and looking for someone else to assign as the Director of the Pre-Law Program. And Dr. McEvoy remains a tenured professor at Fairfield University. This only involves her role as the Director of the Pre-Law Program. And as Judge Say noted at the very end of his decision on Special Appendix Page 32, Fairfield University rotates these Director Programs. There's evidence in the record that these were assigned often to new people. In fact, Dr. Williams was a Director and then it was assigned to someone else. And so Dr. Babington testified that the Director positions are not meant to be permanent positions held by one person. And that's exactly what happened here after her three-year term. Is there a diminution in pay? Well, there was a stipend associated with the Director position. So yes, she received a stipend when she was the Director and then lost that stipend once that was taken away. This is Judge Parker. She was a tenured professor, right? Correct. And remains a tenured professor. And is she teaching? Yes. She's a professor with a class vote, as plaintiffs say in their brief, a full class vote. So yes, she's still teaching. But she's not the Director. And there's a new Director. And that's fully consistent with Fairfield's approach to these Director positions. And in fact, as Your Honor noted in the prior questioning, once Dr. Williams started, he and Dr. Sapp met with Dr. McAvoy and they discussed her replacement at the end of that three-year term and who might be available. And I believe the record shows they even discussed Dr. Alfonzo, who was eventually Yeah, but when she raised her prima facie case of age discrimination and your client had to explain the neutral reason for not renewing her tenure, you didn't say that we just rotate people through these Director positions. You said that her performance was deficient, right? So are you saying she was going to be removed anyway because we just rotate different people through the But that's not the one that you offered, right? I mean, isn't your argument that you would have renewed her but for the deficient performance? Correct, Your Honor. I was just putting the position in context at the university. And so going back to Dr. McAvoy's case, you're right. Dr. Sapp, to begin with, when Dr. Williams started, expressed his concerns about Dr. You're right, Your Honor. Before the district court, the university identified five or six areas where it believed her performance was falling short and wasn't meeting, as Your Honor said previously, the expectations of the university in terms of relations with the Advancement Office, being accessible to students as on page 12 of his opinion. What do we do with stuff that you've all said that she's too traditional? She doesn't have access to email or whatever. I mean, these seem to be things that are stereotypes about people who are older. I mean, why doesn't that create an inference that there's some kind of bias going on? Why shouldn't that be enough of an inference, at least to get past summary judgment? Sure. A couple of things there, Your Honor. One about the email. I mean, it's undisputed that she only had access to email while she was on campus, Monday afternoon through Thursday. And she wasn't there Friday, Saturday, Sunday, and didn't have access to email. And that's an issue. Dr. Williams, there's evidence that he testified about his own difficulties contacting Dr. McEvoy. And going to the statements, Your Honor, the traditional statements that you were discussing with Attorney Steigman, I think Judge Shea did a good job putting those in context. When you read those full block quotes, it's clear he's not targeting Dr. McEvoy. He's expressing thoughts about the program, some of which were based on anecdotes from students and Mr. Pace and other individuals. And moreover— Although, as Mr. Steigman, I think, points out, there are some references that seem to be about her as opposed to the program. Is that right or wrong? Very limited. I think the one, Your Honor, that Dr. McEvoy herself was very traditional, again, that might have been—and then he explains—it might have been the result where she was in the university being in the business school and talks about that. He's not talking about her age or anything like that. He's just talking about her actual role at the university. And so when you read those full quotes, it's clear, I think, that he's talking about the program and not her. And moreover, those are in his deposition well over a year after the decision was made. And in the analysis that the district court went through and that the district courts in this circuit go through, you generally look at who made the remark, when it was made, what's the content, and what was the context, right? And when you put it in that, when you— You're describing a dispute over the fact and what it meant and how it could be understood and so on. And so why isn't that an issue of fact? I mean, we only—we say that summary—or the Supreme Court has said that summary judgment is appropriate only when there's a weak issue of fact as to whether the employer's reason wasn't true and there's abundant and uncontroverted independent evidence that no discrimination had occurred. I mean, if there was something objective, like there was, you know, she promised to create X number of internships and didn't do it, maybe, you know, you would say, well, that is uncontroverted and independent. But when the critique seems to line up with, you know, with sort of stereotypes about older employees, why wouldn't we say that that's just not a weak issue of fact? That's something that should be determined at trial? I think there is—in this case, it is a very weak inference of age discrimination. As Judge Shea said, there's just nothing. The critiques of her performance are very warranted. Being accessible to students, you know, I just mentioned the undisputed facts about her difficulties with accessibility, the poor relationship with advancement. It's, you know, Mr. Pates testified about his concerns about advancement's relationship with her. The failure to align with Fairfield 2020. No vision for the program that Dr. Babington was explaining. Those aren't—those have nothing to do with her age and those are legitimate concerns. How about—this is for Julia. How about what Mr. Steigman describes as the inconsistency of the explanations? Can you address that? Yes, Your Honor. In Dr. Williams' testimony, you know, he testified about certain concerns he had and while he was in favor of—why he decided not to reappoint in terms of her accessibility, Dr. Williams' strategic vision, her reticence to address new developments in the law, Dr. Babington had very similar concerns, right, about accessibility, internship opportunities, student outcomes, et cetera. There's a lot of overlap between those concerns. As Judge Shea noted, I believe on page, you know, 2930, he did a good job—27 to 30, rather, he did a good job walking through. Those aren't material inconsistencies. Those are all variations on the same theme and this court has clarified and stated that employer's justifications were variations on the same theme rather than separate inconsistent justifications. This isn't a case where someone was fired because, you know, on an allegation that they stole something and then later the employer's saying, oh, no, it was really performance-based. These are all concerns that she did not have the program going in the right direction and wasn't meeting the university's expectations and where it needed to go and so they made a change and there's simply no evidence that suggests this was due to her age. And one thing, Your Honor, that we addressed in our brief was the same actor inference, you know, in—Dr. Babington and Dr. Williams appointed her for the one-year term and then they ultimately decided to appoint Dr. Alonzo for the next three-year term. In the plaintiff's reply brief, they claim this is an issue for trial, not for motion for summary judgment. That's just incorrect. The Second Circuit has repeatedly said that it's appropriate on motion for summary judgment. The Schnabel case, the Downey case, both of which are cited in the party briefs, reaffirm that. So, for all of those reasons, Your Honor, we would ask that Judge Shades—So, Mr. Murphy, just very briefly to pick up on, I think, the questions that—some you're saying that we should, on this record, effectively conclude that if someone who is over 40 and well over 40 and so is clearly in the protected class is described as traditional, rigidly backward-looking or whatever it was, and not sort of capable of doing the job any longer, that that is not sufficient evidence by itself that should go to a jury. Absolutely, Your Honor. Those comments, when read in their full context, are not the type of comments that this Court has found sufficient to survive summary judgment. For example, if you compare those comments to comments in the O'Reilly case that's cited by plaintiffs, you know, where in that case, the plaintiff is—individuals were making comments about his specific age, saying he needed a GPS system to find his way home, that he had dementia, et cetera. Those are the type of comments that this Court has focused on. In the Davis-Garrett case, the employee was told he was of that nature. Same thing in the Cross case. You know, the much more egregious comments are the—and directed directly to a plaintiff at the time of the decision or before the time of the decision. Comments in a deposition a year down the road just don't be—especially these comments—don't meet the standard that allows a case to survive. So what you're saying—what you're really saying is that there's no contemporaneous evidence at the time of these comments being made? Correct. Okay. All right. Thank you. Mr. Stegman. Yes, Your Honor. I have a number of things I'd like to raise, but I'll try to cycle through them quickly in my time. I want—before moving on beyond the discriminatory statements, the—this Court recognized in O'Reilly v. Marina Dodge that common stereotype of elderly people is they resist change and new approaches. That directly lines up with this case. This Court stated in Weiss that summary judgment was not appropriate in a case when the issue was the plaintiff was allegedly not energized, which lines up clearly with a need to reinvigorate the program when there was no actual evidence. The problem is the comments that you're harping on were directed at the program. Your Honor, that's not entirely— The fact that the program didn't meet the university standards, what has that got to do with her age? Your Honor, the premise of the question is not entirely supported by the record. So on page 25 of our replied brief— Just do the best you can with it. Yeah. So Dr. Williams testified, and this is a quote, that Dr. McAvoy herself was very traditional. He was not speaking about just the program. In a conversation that Dr. Williams claims happened but never happened, and so it shouldn't be credited, he said that Dr. McAvoy was rigidly opposed to changing the program away from this corporate and criminal law focus, which never existed in the first place. The district court also erred by allowing an inference actually in favor of the defendant that these statements shouldn't be identified as a basis for an inference of age discrimination because he was talking about the program and because he was attributing statements to some things that Pates had said, but Pates denied that he said these things. Pates, when asked during his deposition, denied that he had any complaints about the program. Pates denied that he communicated to Dr. Williams any criticisms of the program itself. And so the district court erred by not only making inference in favor of Dr. Williams to find a more favorable and generous interpretation of the statements, but the district court ignored the fact that in making these statements, Dr. Williams falsely attributed them to a source that denied making them. And so it's just consistent with Dr. Williams' complete and consistent dishonesty during his deposition that would allow a jury to find that he's not credible on anything he said. I'm sorry, has my time expired, your honor? Yeah, I believe that I believe it has. Judge Monash, do you have any other questions? No, I'm fine, thank you. All right, thank you very much. Oh, Judge Parker? No, I have no further questions. Okay, thank you, Mr. Stegman and Mr. Murphy. We'll reserve a decision. Okay, thank you.